UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

BRUCE FRYMOYER,

       Plaintiff,

    v.

EAST PENN MANUFACTURING
COMPANY, INC.,

       Defendant.

No. 5:16-cv-05035

# **O P I N I O N**

**Defendant's Motion for Summary Judgment, ECF No. 25 – Granted**

**Joseph F. Leeson, Jr.**                                                                                   **June 1, 2017**
**United States District Judge**

## I.     Introduction

Bruce Frymoyer claims that his former employer, East Penn Manufacturing Company, Inc., terminated him to avoid incurring further workers' compensation expenses for a knee injury that he suffered at work. He claims that East Penn violated the Rehabilitation Act of 1973 and Pennsylvania common law by discriminating against him on the basis of a disability and retaliating against him for seeking workers' compensation. East Penn has moved for summary judgment. Because no reasonable jury could find a causal link between Frymoyer's termination and either his knee injury or his claims for workers' compensation, summary judgment is warranted in East Penn's favor.

## II.     Background[1]

East Penn manufactures batteries. It employs approximately 8,000 employees at a facility in Lyons Station, Pennsylvania. Frymoyer was one of those employees. He was a maintenance technician, and in May 2012, while at work, he suffered an injury to his left knee. The injury required surgery, and East Penn covered the cost as a workers' compensation expense. After the surgery, Frymoyer missed about two months of work. Upon his return, he resumed his same duties at his same rate of pay.

About a year later, Frymoyer began experiencing pain in the same knee. He received occupational therapy from East Penn's medical department, but East Penn denied his request to

---

[1]     Except where noted, this background information is taken from East Penn's Statement of Undisputed Material Facts, ECF No. 25-2, and the numbered paragraphs that make up the factual overview at the beginning of Frymoyer's brief, ECF No. 30, and is not in dispute.

pay for a second surgical procedure. He went ahead with the procedure anyway and missed approximately three months of work—from May 6, 2014, until August 18, 2014—while he recovered. In their briefs, both sides allude to the fact that he filed a petition with the Pennsylvania Department of Labor and Industry to challenge East Penn's decision to deny coverage, which was ultimately successful, but neither side discusses that proceeding in much detail.

When Frymoyer returned to work on August 18, 2014, he again resumed his same duties at his same rate of pay. At his deposition, he testified that his knee injury fully healed as a result of this second procedure and has not given him any further trouble. Frymoyer Dep. 30:14-21, ECF No. 25-5.

In early September 2014, a few weeks after he returned to work, he was called to the office of Anthony DiBenedetto, East Penn's personnel coordinator. After asking how Frymoyer was feeling following the surgery, DiBenedetto informed him that he had exceeded the number of absences he was permitted to take under the company's leave policy. He provided Frymoyer with a copy of the policy and asked Frymoyer to acknowledge in writing that he received it, but Frymoyer refused. DiBenedetto made a note of the meeting and placed a copy of the note in Frymoyer's personnel file.

About five months later, an incident occurred in the maintenance department where Frymoyer worked. Someone had thrown an object—apparently a fuse or a metal nut—at a computer screen and damaged it. Frymoyer was summoned to a meeting with DiBenedetto and two other East Penn personnel representatives, who informed him that another employee had identified him as the one who threw the object. Frymoyer Dep. 35:8-38:2; Frymoyer Dep. Ex. D-2, ECF No. 25-5. Frymoyer denied responsibility, but the group told him that he would be suspended while the incident was investigated further. *Id.* He was sent home immediately after the meeting. *Id.*

Later that day, DiBenedetto reported the incident to East Penn's personnel director, Alison Snyder. After reviewing a few written reports of the incident that had been prepared, she decided that a further investigation was warranted. She and DiBenedetto proceeded to interview a number of employees who were present at the time of the incident.[2] Snyder Dep. 20:3-21:25, ECF No. 25-4. As Frymoyer had been told, one of those employees, who said that he had witnessed the incident first-hand, identified Frymoyer as the one who threw the object. He also signed a written declaration, under penalty of perjury, attesting to his account. *See* Eshbach Decl., ECF No. 25-6.

Frymoyer's counsel claims that he sent Snyder an email the evening after Frymoyer was suspended, warning her that taking any action against Frymoyer would be viewed as retaliation for Frymoyer's exercise of his workers' compensation rights:

---

[2] East Penn's Statement of Undisputed Material Facts leaves out the fact that Snyder testified that DiBenedetto participated in this process—a point that Frymoyer contends is particularly important.

> Ms. Snyder: given that you consider yourself a human resources professional, I will presume you are aware that it's illegal to retaliate against someone because he has filed a workers' compensation claim. If you fire Mr. Frymoyer based on an incident in which he wasn't involved (and had witnesses to attest that he was not involved), your company will be liable for a Wrongful Termination claim under Pennsylvania [law]. He's been an excellent employee for eight years. Leave him alone. . . . The last retaliation case I had to try led to a $750,000 verdict for emotional distress, plus reinstatement to the job and lost pay. I'm sure you don't want something like that on your record.

Pl.'s Br. Ex. 7, ECF No. 31-7. Snyder denies that she ever received the email.[3]

A few days after his suspension, DiBenedetto and Snyder spoke to Frymoyer by telephone about the incident, and he maintained his innocence. Two days later, an in-person meeting was convened with Frymoyer at East Penn. DiBenedetto, Snyder, and another East Penn personnel representative attended, and at the end of the meeting, they informed Frymoyer that he was being terminated. Frymoyer Dep. 43:10-25; Frymoyer Dep. Ex. D-4. According to Snyder, they ultimately credited Frymoyer's coworker—who claimed that he saw Frymoyer throw the object—over Frymoyer, in part because they had been told that the two of them were friends, which, in their minds, made it unlikely that Frymoyer's co-worker had any motive to fabricate his story. Snyder was the only employee present at the meeting with termination authority, but both Snyder and DiBenedetto signed Frymoyer's termination notice.

Frymoyer maintains that he was not responsible for damaging the computer screen. He believes that he was blamed for the incident as a pretext to terminate him for seeking workers' compensation for the two surgical procedures he underwent to treat his knee injury. On that basis, he claims that the decision to terminate him constituted discrimination on the basis of a disability in violation of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794(a),[4] and a wrongful discharge under Pennsylvania common law, *see Shick v. Shirey*, 716 A.2d 1231, 1232 (Pa. 1998) (holding that an "employee who alleges retaliatory discharge for the filing of a workers' compensation claim has stated a cause of action" under Pennsylvania common law).

### III. Standard of Review – Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[3] In support of Snyder's claim, East Penn produced deposition testimony from its director of information technology, who testified that he searched for the email in an electronic archiving system that East Penn has in place, which preserves a copy of every email received by East Penn's email server—even if the recipient deletes the email from his or her personal inbox—and found no trace of the email having ever been received by East Penn's email server. Roth Dep. 7:9-9:16, ECF No. 35-4.

[4] The Rehabilitation Act prohibits discrimination on the basis of a disability by any "program or activity receiving Federal financial assistance," including any corporation that receives federal financial assistance. § 794(b)(3)(A)(i). East Penn admitted that it meets that requirement. *See* Compl. ¶ 22; Answer ¶ 22, ECF No. 8.

Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

IV. **Summary judgment is warranted in East Penn's favor.**

A. **Legal Framework – The Rehabilitation Act Claim and the Pennsylvania Common Law Wrongful Discharge Claim**

"[T]he Rehabilitation Act 'forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement,'" *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007), and Pennsylvania common law prohibits employers for terminating an employee "for filing a workers' compensation claim," *Shick*, 716 A.2d at 1237.

While these two claims are directed at two different sources of discrimination, they are analyzed under the same *McDonnell Douglas*[5] burden-shifting framework. *See Wishkin*, 476 F.3d at 185 (recognizing that the "framework established in *McDonnell Douglas* . . . for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act." (citation omitted)); *Dunsmuir v. May Dep't Stores Co.*, 120 F. App'x 927, 929 (3d Cir. 2005) (characterizing as "sound" the approach of analogizing a claim for wrongful discharge under Pennsylvania law for seeking workers' compensation to a claim for retaliatory discharge under Title VII, and proceeding to analyze the claim under the *McDonnell Douglas* framework).

Accordingly, to prevail on either claim, Frymoyer first has to show that there was a causal connection between his termination and either his disability or the claims he filed for workers' compensation.[6] If he is able to do so, the burden shifts to East Penn to articulate a legitimate, non-discriminatory reason for his termination. If it can, the burden shifts back to Frymoyer to show that East Penn's explanation is pretexual, either by discrediting the plausibility of that explanation or pointing to evidence suggesting that animus was in fact a motivating factor. *See Wishkin*, 476 F.3d at 185; *Dunsmuir*, 120 F. App'x at 929.

B. **The Parties' Contentions**

East Penn contends that Frymoyer has failed to make out a prima facie case of discrimination because no reasonable jury could find a causal link between East Penn's decision

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).
[6] East Penn argues that the injury Frymoyer suffered to his knee—which he admits has fully healed—was merely a transitory impairment that does not qualify as a disability under the Rehabilitation Act. This contention need not be addressed because, as will be seen, no reasonable jury could find in Frymoyer's favor on his Rehabilitation Act claim even if his injury qualified as a disability under the Act.

to terminate him and either his past claims for workers' compensation or his knee injury. In particular, East Penn points to the fact that Snyder—East Penn's personnel director, and the only person involved in the investigation of the object-throwing incident who had firing authority—testified that at the time the termination decision was made, she had no knowledge of Frymoyer's knee injury or that he had sought workers' compensation.

In response, Frymoyer points to the email his counsel claims that he sent to Snyder the evening after Frymoyer was suspended as proof that Snyder was aware of his knee injury and his workers' compensation claims. Snyder claims she never received that email, but Frymoyer contends that, at the least, that presents a dispute of fact. Even if Snyder is to be believed, he claims that DiBenedetto knew about his workers' compensation claims and had previously "disciplined" him[7] by warning, at their September 2014 meeting, that Frymoyer had exceeded the number of absences he was permitted under the company's leave policy. In Frymoyer's view, even if DiBenedetto was not the final decision-maker, his involvement in the investigation was sufficient to taint the decision-making process.

In response to that, East Penn points to a declaration from DiBenedetto, in which he states that he had no knowledge that Frymoyer had filed a workers' compensation claim for the second surgery that he underwent. *See* DiBenedetto Decl. ¶¶ 4-5, ECF No. 35-4. He also points out in his declaration that workers' compensation claims are handled by a separate medical department at East Penn, and he claims that no one made him aware that Frymoyer had filed a claim. *Id.* at ¶ 4.

Frymoyer maintains that there is a genuine dispute over whether DiBenedetto knew about his claim, but the only evidence Frymoyer offers in support—a declaration he signed setting forth his recollection of the September 2014 meeting—makes no reference to any discussion the two had during the meeting about his workers' compensation claim:

> Once I got to [DiBenedetto's] office he said have a seat, that he had to go over my attendance with me. He first asked how my surgery went and how I was feeling. Then he told me that I went over their policy limit of days and I was getting an unexcused absence warning. I said I was out on surgery how can that go against my attendance? He said it's our policy and told me to sign it.

Frymoyer Decl. ¶ 1, ECF No. 31-4.

The document that DiBenedetto asked Frymoyer to sign, titled "Initial Attendance Warning," also contains no reference to workers' compensation claims. Rather, it is a standard form document that explained the following to Frymoyer:

> According to your attendance record, in the previous six months, you have four separate occurrences of doctor excuses or missed more than ten days from work

---

[7] *See* Pl.'s Br. App. ¶¶ 12, 24, ECF No. 30.

for being ill. As you know, regular attendance is an essential part of your job and is very important to the effective operation of our company.

Pl.'s Br. Ex. 6, ECF No. 31-6.

### C. No reasonable jury could find a causal link between Frymoyer's termination and either his knee injury or his workers' compensation claims.

In Frymoyer's view, either Snyder or DiBenedetto, or both, used the object-throwing incident as a pretext to terminate him because of either his knee injury or his claims for workers' compensation, which he contends establishes the requisite causal link between his termination and discriminatory animus. *See* Pl.'s Br. App. ¶ 19 ("Plaintiff denie[s] throwing anything and, accordingly, denies [that] any legitimate investigation was done. . . . Plaintiff contends that DiBenedetto and Snyder blamed [him] solely as a way of justifying an otherwise illegal employment decision."). But Frymoyer has not produced sufficient evidence for a jury to find that either Snyder or DiBenedetto may have been motivated by animus, and he has pointed to no other evidence to suggest a causal link between his termination and discrimination.

Taking Snyder first, the parties dispute whether she was aware of Frymoyer's workers' compensation claims at the time the decision was made to terminate him—either by virtue of the email that Frymoyer's counsel claims that he sent her (which she says she never received) or from her discussions with DiBenedetto, who Frymoyer claims was aware of his knee injury and his workers' compensation claims. But even if Snyder had been aware of his knee injury or his workers' compensation claims, that alone would not permit an inference of discrimination because "[t]he mere fact that an employer is aware of an employee's impairment [or claim for workers' compensation] is insufficient to demonstrate . . . that that [knowledge] caused the adverse employment action." *See Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996); *Alexander v. Red Star Express Lines of Auburn, Inc.*, 646 F. Supp. 672, 681 (E.D. Pa. 1986) ("The fact that the discharge occurred after plaintiff filed for benefits does not constitute evidence of retaliation based on the *post hoc ergo propter hoc* reasoning."), *aff'd*, 813 F.2d 396 (3d Cir. 1987). Were it otherwise, "a person in a group protected from adverse employment actions . . . could establish a *prima facie* discrimination case merely by demonstrating some adverse action against the individual and that the employer was aware that the employee[] [belonged to] the group." *Kelly*, 94 F.3d at 109. Other than his contention that Snyder knew about his workers' compensation claims when she signed off on his termination, Frymoyer has not pointed to any evidence that would link her decision to terminate him to his efforts to seek workers' compensation (or to his knee injury).

That leaves DiBenedetto. As a threshold matter, East Penn contends that no inquiry need be conducted into his motivations because Snyder was the sole decision-maker. While East Penn acknowledges that DiBenedetto was the one who initiated the investigation into the object-throwing incident, that he was present with Snyder for all of the interviews with Frymoyer and the other possible witnesses, and that he was present when Frymoyer was terminated, East Penn

6

nonetheless contends that DiBenedetto was not a decision-maker—largely because he did not have formal termination authority.

Whether a particular employee is part of the decision-making process turns on a practical assessment of the employee's role in the process, not on a formalistic distinction between those employees who possess termination authority and those who do not. Whether the employee possesses termination authority is a relevant consideration, but so too is the nature of the employee's role in the organization and, more directly, the actual extent of the employee's participation in the decision-making process. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) (concluding that two employees were not decision-makers because they did not have termination authority, did not supervise the employees who were terminated, and did not participate in the decision to terminate them). In this case, there is ample evidence from which a jury could infer that DiBenedetto—who supervised Frymoyer in his role as East Penn's personnel coordinator and who was present for all of the phases of the investigation that led to Frymoyer's termination—was involved in the decision-making process. *See, e.g.*, *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 & n.8 (3d Cir. 2003) (finding sufficient evidence for a jury to infer that an employee was a decision-maker because she held a supervisory position with the company and "was present . . . when [the plaintiff] was fired").

DiBenedetto's involvement in the decision-making process does not, itself, establish a link between Frymoyer's termination and his knee injury or his workers' compensation claims—there must also be evidence to suggest that he may have been motivated by discriminatory animus. As with Snyder, Frymoyer stresses the fact that DiBenedetto knew about his knee injury and his workers' compensation claims at the time the decision was made, but, as with Snyder, the mere fact that DiBenedetto knew that information does not give rise to an inference that he was motivated by it.[8] *See Kelly*, 94 F.3d at 109.

Other than his contention that DiBenedetto knew about his knee injury and workers' compensation claims, Frymoyer points to a single encounter that, in his view, evidences that DiBenedetto harbored a discriminatory motive: the September 2014 meeting, when DiBenedetto explained East Penn's standard leave policy to Frymoyer and informed him that he had exceeded the number of absences permitted under the policy. Frymoyer characterizes that meeting as

---

[8] As mentioned, there is some question about Frymoyer's ability to establish that DiBenedetto even knew about his workers' compensation claims. The only evidence Frymoyer has pointed to in support of that assertion is a paragraph from his own written declaration, in which he recalls that at their September 2014 meeting, DiBenedetto asked him how his recent surgery had gone. At summary judgment, the evidence must be taken in the light most favorable to the non-moving party, but given that Frymoyer's own recollection of the meeting contains no mention of any discussion the two had about his workers' compensation claims, it would take a particularly generous leap for a jury to infer from that testimony alone that DiBenedetto was aware that Frymoyer had a pending workers' compensation claim. *See Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1277-78 (2017) (Alito, J., concurring in the denial of certiorari) (suggesting that it is, at best, "surely debatable" that a plaintiff whose own recollection of events makes no reference to a critical fact that the plaintiff needs to prove could survive summary judgment).

In any event, even if a jury could find that DiBenedetto knew about Frymoyer's workers' compensation claims, the result would be no different, because—as will be seen—Frymoyer has not produced sufficient evidence from which a jury could infer a causal link between that knowledge and his termination.

"DiBenedetto disciplin[ing] [him] for being out on workers' compensation,"[9] but the problem with that characterization is that at the time of the meeting, East Penn was of the view that Frymoyer's second surgery did not qualify for workers' compensation coverage. Frymoyer later succeeded in challenging that determination by filing a petition with the Department of Labor and Industry, but it is not discriminatory for an employer to enforce its standard policies at a time when the two sides are engaged in a good-faith dispute over an employee's eligibility for additional workers' compensation.[10] *See generally* 77 Pa. Stat. Ann. §§ 717.1, 751 (explaining that when an employer becomes aware of an employee's injury, the employer has the option to pay compensation, provide temporary compensation pending a further investigation, or decline to pay compensation and notify the employee that it is contesting the claim, in which case the employee is not eligible for benefits unless the employee later succeeds in petitioning the Department for a favorable determination).

Aside from the fact that the contents of the meeting are not suggestive of discrimination, the meeting also occurred at a temporally remote time from his later termination. Even if a jury could find that the meeting evidenced that DiBenedetto (or, more generally, East Penn) harbored animus toward Frymoyer for seeking workers' compensation, the fact that five months passed before he was terminated—with no change to his job duties or rate of pay, and no suggestion of any other conduct that occurred during that time that was suggestive of any discriminatory animus—attenuates any connection it might have to the later decision to terminate him. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (observing that "[s]tray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision"). Perhaps most significant of all is Frymoyer's admission that the second surgery completely healed his knee injury and that he has had no further trouble with it. Frymoyer's theory of the case is that East Penn's "top managers . . . were concerned at the cost of his workers' compensation claim," "believed he would be a continuing expense due [to] his impaired knee," and "believed he was damaged goods and would be a perpetual liability," Compl. ¶ 20, but that is difficult to square with his concession that his knee had fully healed months before he was terminated and that his surgeon had informed East Penn of that fact nearly two months before his termination, *see* Pl.'s Br. 4, ¶ 17.

Even when considered in the light most favorable to Frymoyer, no reasonable jury could find a causal link between Snyder and DiBenedetto's decision to terminate him for the object-throwing incident and either his knee injury or his workers' compensation claims.

---

[9] *See* Pl.'s Br. App. ¶ 24.
[10] Frymoyer recognized as much during his deposition, where he explained that around the time of the meeting with DiBenedetto, there was a dispute over whether his leave would be covered "under workmen's comp and not under . . . [ordinary] [s]hort-term disability." *See* Frymoyer Dep. 30:22-32:8.

**V.     Conclusion**

Because no reasonable jury could find a causal link between Frymoyer's termination and either his knee injury or his workers' compensation claims, he cannot establish a prima facie claim for discrimination under the Rehabilitation Act or wrongful discharge under Pennsylvania common law. Summary judgment is therefore warranted in East Penn's favor. An appropriate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge